**HINES, Director General of Railroads, v. HADNOT.   (No. 529.)**

(Court of Civil Appeals of Texas. Beaumont. March 13, 1920. Rehearing Denied March 31, 1920.)

Carriers ⬤═327—Passenger held contributorily negligent in walking off from platform.

Where a passenger walked out of the station on a dark night onto a platform which she knew was raised above the ground, and after the door was closed behind her cutting off all light she started in a direction opposite to that intended and walked off the platform without paying particular attention to where she was going, she was contributorily negligent as a matter of law, and cannot recover.

Error from District Court, Jefferson County; W. H. Davidson, Judge.

Action by Emma Hadnot against Walker D. Hines, Director General of Railroads. Judgment for plaintiff, and defendant brings error. Reversed, and judgment rendered for defendant.

Orgain, Butler, Bolinger & Carroll, of Beaumont, and Baker, Botts, Parker & Garwood, of Houston, for plaintiff in error.

Guy Robertson, of Rising Star, and Leslie E. Eason, of Beaumont, for defendant in error.

BROOKE, J. The plaintiff, Emma Hadnot, a feme sole, filed her original petition in the district court, Jefferson county, Tex., on the 23d day of February, A. D. 1918, and thereafter, on June 17, 1918, filed her first amended original petition, being the petition on which she went to trial, said petition alleging that the plaintiff went into the defendant's station at Voth, in Jefferson county, and on leaving same in the nighttime fell from the platform, something like four feet, to the ground, and was bruised and suffered a concussion of the spine and various abdominal injuries, producing hemorrhage, and other injuries of a permanent and incurable nature.

---

⬤═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

She also alleged that the defendant company was negligent in not having a light on said platform, and that the defendant was negligent in not having a railing about the end of said platform, and that the plaintiff was not negligent in leaving the platform as she sought to leave it.

The defendant demurred to plaintiff's petition, and denied the allegations contained in plaintiff's petition, and specially pleaded as a defense that the plaintiff was guilty of contributory negligence in seeking to leave the platform as she did, and that such act of negligence was the direct and proximate cause of the accident. Defendant's demurrer and exceptions were overruled, defendant excepting. At the close of the testimony the defendant requested a peremptory instruction in its favor, which was refused by the court, and thereafter said cause was submitted on special issues to the jury, which special issues were answered in favor of the plaintiff, assessing plaintiff's damages at $500, and thereafter judgment was entered against the defendant for said sum. Defendant duly filed a motion for new trial, and later an amended motion for new trial, and the same, being presented to the court, was in all things overruled, defendant excepting, and from such action of the court the case has been properly brought to this court on writ of error.

This suit was originally instituted against the Texas & New Orleans Railroad Company as defendant, but it subsequently developed that Walker D. Hines, Director General of Railroads, had charge of and was operating the Texas & New Orleans Railroad Company, the original defendant, together with certain other railroads in the United States of America, and that any cause of action, if any plaintiff had, was against the said W. D. Hines, Director General of Railroads, and the said Walker D. Hines, having issued an order that, where causes of action arose during the operation by himself of said roads, he should be substituted as defendant, and the railroad company should be dismissed as the defendant, it was agreed between the attorneys, Messrs. Guy Robertson and Leslie E. Eason, representing the plaintiff, and Orgain, Butler, Bolinger & Carroll, representing the defendant Texas & New Orleans Railroad Company, and Walker D. Hines, Director General of Railroads, that the said Walker D. Hines, Director General of Railroads, be substituted in place of the Texas & New Orleans Railroad Company where the name of such company appeared among the papers on file.

Appellant's first assignment of error is as follows:

"The court erred, to the prejudice of the defendant, in overruling and refusing to sustain defendant's request for peremptory instruction, such requested peremptory instruction being as follows: 'You are instructed that plaintiff was guilty of contributory negligence in trying to leave the platform as she did, and that such negligence was the proximate cause of her injury, if any, and you will render your verdict against the plaintiff, and for the defendant, and you will so find.'"

Article 6591, Vernon's Sayles' Texas Civil Statutes, provides:

"Every railroad company doing business in this state shall keep its depots or passenger houses in this state lighted and warmed, and open to the ingress and egress of all passengers who are entitled to go therein, for a time not less than one hour before the arrival and after the departure of all trains carrying passengers on such railroad; and every such railroad company, for each failure or refusal to comply with the provisions of this article, shall forfeit and pay to the state of Texas the sum of fifty dollars, which may be sued for and recovered in the name of the state in any court of competent jurisdiction, and shall be liable to the party injured for all damages by reason of such failure."

We will discuss the testimony of the witnesses on the issue of contributory negligence. The plaintiff, Emma Hadnot, testified:

"As to how I got to the depot, well, we walked from Mrs. Keith's house over to the office, and then to the depot, and I had never gone there before to the depot. I did not go down the track to the depot. I just went to the depot and came in this way; it was level. I came in from the side where the railroad is, and there was no light, and I couldn't see which way I was going, and we made a mistake and went in the white side, and a lady told us to go around in the back, and she shone a candle from the window to show us where we could go in it, and we went in there and put down our bundles, and naturally we wanted to step out, and we went outside, and we thought we were going as we did when we went in. After I got in there, Jane Perry and Ethron Rhone were with me. Ethron is at Mineral Wells. Those two were with me when I went into the colored waiting room. I then handed them to him, and she asked and said, 'Let's go outside,' and we went outside the door, and while I said, 'Let's go'—when I started, I fell off that place, whatever it was, backwards. It was cold that night, and drizzling rain. There was no light when I stepped out, that I seed. I was out just a few moments when I fell off; I just stepped on out and fell off that platform; I said it was so dark I couldn't see. I fell immediately, right off. I cannot form any idea about how far I fell. It seems like to me it was a very far distance. When I hit the ground it seemed like everything went dark. As to the platform, I had never been there before. I had never been on that side of the road before. When I got on to the depot, I did not have to climb up on anything; I went from the ground right onto the platform."

On cross-examination she testified:

"I had never been about the Voth depot with Jane Perry before; never had been to that depot, never before. I don't know what time the train was due to leave Voth that night; they just said the train was late. They did not tell me how late it was; they said it was a few

minutes. I don't know what time the train was due there.

"When I got upon the platform I didn't step up about a foot to get up on the platform. There is a step at the platform, but we didn't have to step no foot up, because I went to the white side first. I could see by the light shining sufficiently well to take that step and get up on the platform to get to the white waiting room, not the colored waiting room. The waiting room I got into was the white part, and she asked me out of there. I could see by that light showing from that window sufficiently well to take that step on the platform, and to get into the white waiting room. I didn't fall in doing that. There was a lamp in the white waiting room.

"I bought my tickets and turned to Jane Perry and said, 'Let's go out a few minutes.' I didn't have any other conversation with the agent at the time; I didn't have nothing to say; all I asked her was to sell me a ticket to Beaumont; that is all I had to say. Before I went out I didn't have anything to say, and I only had a bundle, and I delivered that to Ethron, and got my ticket and went outdoors; I never said a thing to her, and I turned and walked out. I wanted to urinate, and there wasn't no place to go, and I thought I would step on the outside. I didn't ask the agent anything at all; I stepped outside, and thought we were going to the right place. I stepped out first, and Jane stepped out and shut the door. She stopped and shut the door because it was cold and rainy. Ethron Rhone and her little baby tot about three or four years old was left in the room. As to why I didn't turn back the way I came in and turned and went in another direction, well, I didn't know where I was going; I had come in there about three or four minutes before; I came in from a way that I knew was safe, and had got in without falling. It was as dark as pitch when I went out from the waiting room. I walked off ahead of Jane. I didn't ask Jane any questions at all. Jane Perry didn't say, 'You can't go off and walk off that way on the platform;' she didn't say anything.

"I didn't notice any window that opens from that colored waiting room onto the platform; in fact, I didn't look for them; I just thought I was all right, you understand, and just stepped on out of doors. There wasn't any lights out there at all—no kind of a light. I don't know how many steps I had taken after I turned from the door before I fell. I don't know how far it is, and I don't know how far I fell, or anything about it, but I just know I fell, and I stepped a few steps from the door. As to when I felt my foot not striking any steps, did I try to draw back and keep from falling—child, I was going so fast I didn't know where I was going; I just made and turned to go, and it seemed to me I went backwards, I fell so quick and so fast. I took— I took these steps forward and turned to Jane, and waited for her; I could see her from the dark. I was talking to her; I knew it was Jane Perry. There wasn't anybody there but her; I seen her; there wasn't any light at all, not any.

"I didn't know there was any way to go off, and it was raining and cold, and no fire, and we didn't care to go out and open the door; I

just turned and walked and started to turn around, and fell off—I wasn't looking for any steps; I didn't think about any steps. I just thought everything was all right. I didn't give it any thought at all. I had come up on the platform all right. When I went to leave the platform I never thought about any steps at all; I didn't give it any thought at all; the only thing I was thinking about was what I wanted to do. I wasn't thinking about the platform. I looked back to see if Jane Perry was coming. I did not ask her whether or not I could leave that platform that way; I didn't ask her any questions. I knew that she had lived there something over five years. I never asked her any questions or not, because I was in a hurry and wanted to go outdoors."

On redirect examination she testified:

"There was no railing there at all where I fell off."

Jane Perry, witness for plaintiff, testified:

"I know Emma Hadnot. I recall the circumstance of her being hurt by falling off that platform in January. We went to the depot for her to go home. It was good and dark, and had been drizzling rain when we went to the depot. That is the Texas & New Orleans depot I am talking about. As to how we got to the depot, we went down the switch on by Mr. Keith's place to see him about getting a house out there. After we leaves there we goes from there to the depot, and it was still drizzling rain, and when we gets there she asked us to step out. In going to the depot we had to cross over the Texas & New Orleans Railroad in going to the depot. We got up on the depot by going right up on the side next to the track as we come across. We then went into the waiting room, and she asked us to go out. There was me and Emma Hadnot, and this other gentleman was there, too, but, of course, he didn't step aside with us, and she—she goes to step out, and I steps to pull the door to, and as I went to pull this door to behind me she had done fell just that quick. You see, the gallery wasn't that wide. Just as she gets there—she goes out of the waiting room ahead of me. I shut the door. Then she fell off this gallery; I heard her when she fell; that is how I knew she fell off. It was dark. It was good and dark, and it was cloudy. I did not know that jump-off was there. I had never been to the depot before because I never do go nowhere."

On cross-examination this witness testified:

"I couldn't tell you anything about how the ground was or the platform. That night when I left Keith's to go over to the depot I could see the depot well enough to know in which direction it was. When we got close to it we could see the depot; it was awful dark, though. I could make out there was a building, and that was the depot I had seen, and knew it was the Texas & New Orleans depot. When crossing the railroad track it is level gravel against the railroad track; and the part that runs around by the colored waiting room isn't as high as the opposite side. It is gravel, and, of course, if you step up one or two steps, it is plank. After I crossed the depot, I went across the

gravel there between the railroad and the plank platform. I could feel it was gravel I was walking on. It was dark. I could see the depot building. It wasn't ground I was walking on; it was gravel. I couldn't see it in the dark. Any one could see a building when you walk up to it, and with the little flash light from the door. I don't know how many steps I had to take in going from the gravel up to that platform. I reckon as many as two. I could see well enough in getting upon the platform, and had to take a step or two, and I didn't fall in getting up on the platform. I don't remember who bought the tickets.

"She went out first, and I followed behind. We went out that way because we just thought that was a level walk to go out behind the place, instead of coming out in front of it. I don't know what she thought, but we knew we couldn't go out to the front there to go aside. I didn't know whether there were any steps there. I didn't ask the agent if there were any place I could go without stepping off. I closed the door. Emma went on out to the opposite side and walked off. She turned and walked away from the direction she had come. We didn't go out the way she went in. I don't remember her say, 'Let's go back out this way, because it is dark out here.' I helped her up. I got down from the platform like that (indicating) and jumped down. I could see it was a platform when I looked down to see where she was. I could see well enough that I could see how to get down and get off the platform. I got down so that I could jump down; I could see that Emma had fallen and was lying on the ground. I am right sure that she was lying on the ground. I didn't fall off the platform. When she went out there she did not turn and walk backwards. She went on walking out, and that is the time she fell.

"I don't know if that platform is as much as four feet away from the side of the door. I wouldn't try to say; I reckon it is. Whatever distance that is, she had to walk it to fall off. I did not face the door when I pulled it to; I thought it had come to, and when I seen it didn't I reached back to pull it. She was walking along the platform. Nobody would walk with their back towards the place where she fell off. There wasn't anything to keep her from walking backwards. She could have, but she couldn't have walked out backwards; she was going forward when I seen her. She didn't walk backwards to me. I could see her walking; I was right at her. It wasn't such a long distance that I couldn't see her."

Bessie Emery, witness for defendant, testified:

"On the night of January 30th Emma Hadnot bought a ticket from me at the Voth station. When she bought this ticket she said she wanted a ticket, and then she merely mentioned the fact that she had fallen from the platform. There was no one supporting her at the time she had those conversations with me. She said nothing at all to me about suffering.

"My ticket office is between those two, but it is back behind both of those waiting rooms. There is a partition between the two waiting rooms. The whole building is about 9½ feet wide. There is a space between the railroad and the depot. That is filled with gravel up level with the railroad, not level with the platform—just one step there. That isn't quite as high as this floor step (indicating). That is the only step you take to go from the railroad onto this platform. The place where she fell off is about four feet high. There is no railing or anything there at the end of the platform. We didn't have a light on the platform that night."

On redirect examination she testified:

"As to that step that leads from the gravel up to the plank platform, you step up on a step, and then from the step up onto the platform."

In Stamp v. Eastern Railway Co. of New Mexico, 161 S. W. 450, the facts were not as strong as those in the case now before us, in that Mrs. Stamps did not know that the platform from which she fell and on which she was walking was a raised platform, and therefore was not on notice as to same being raised, whereas Emma Hadnot, in the case now before us, was on notice that the platform on which she was walking was a raised platform; and, never having been upon the platform before, she could not presume, being on notice that she had come upon the platform at a place where it was raised, that it would not be raised at any other place that she might try to leave it. In the aforesaid case the plaintiff sought to hold the railway company on two alleged acts of negligence, as Emma Hadnot sought to hold the defendant in the instant case; the acts of negligence being that the defendant was negligent in not having a light upon the platform and in failing to have banisters around the platform. The trial court in the aforesaid case, having instructed a verdict for the defendant, holding that the acts of Mrs. Stamps constituted such negligence as to preclude her from recovering as a matter of law, and the Texas court having sustained the peremptory instruction, we set out at length the facts of that case, which are as follows:

"At the station where the injury occurred the railroad track in front of the waiting room extended east and west, and the depot was parallel thereto. The appellant, her son, and the latter's wife went to the depot in time to catch a train leaving for the East about 4:30 in the morning, and walked into the waiting room at the east end of the depot, which was not lighted at the particular time, with a light only in the office of the agent or operator. Her son left the waiting room for the purpose of looking for the train, and Mrs. Stamp testified that, after her son walked out, 'I walked out on the platform myself. I do not know why I went out there. It was then dark, and it was kind of cold, and it had been raining the fore part of the night. * * * It was chilly and damp in the depot, and one purpose was to walk around a little and exercise. I had no special motive in going out there. The door to the waiting room is right in the southeast corner. I walked out that door and got turned around on the platform. I turned

around the southeast corner. * * * I walked along the platform at the east end of the waiting room. I do not know how far I walked; I probably went to the edge; I· did not think I did. * * * I turned then and started back towards the waiting room door. I went, I suppose, too close to the edge of the porch, and fell off of it into the hole. There was no light on the platform at the time. I did not know that the platform was built up off of the ground. I did not know there was any jump-off there from the platform to the ground. I do not know whether I· just walked right straight off the platform or not. I did not know how near the edge of it I was. My left foot went off of the platform first. I turned going back with my side this way, * * * and that threw my left side to the outer edge of the platform. My left foot went off first. I do not know anything that happened after my foot went off of the platform.' The son who accompanied Mrs. Stamp on this particular occasion testified in her behalf: 'This platform extends somewhere about 30· feet from the east end of the depot.'"

Judge Hendricks, in writing the opinion, held:

"We conclude that it was quite dark, and for this purpose only, regarding her as a passenger under the law of this state, that the railroad company had not exercised the degree of care obligatory upon it under the circumstances. But we are inclined to think that this woman was guilty of contributory negligence. When she walked out of the door of the waiting room and turned at right angles and proceeded into the dark, along the platform of the appellee, the railway company, to the edge of the platform, precipitating herself off the platform to the ground, that inherently her act is indicative of a degree of carelessness and negligence as to preclude a recovery."

It is true in this case the defendant company owed the plaintiff certain duties, but it is equally true that the plaintiff, in going upon the platform, or in walking about the platform, or in seeking to leave the platform, owed to the defendant the duty of exercising ordinary care for her safety and ordinary care in seeking to leave said platform. Under the aforesaid authority it cannot be disputed, when the law in that case is applied to the facts in this particular case, that the said Emma Hadnot did not· exercise any care whatever, and her acts were so reckless and in such disregard of self-preservation that, as a matter of law, she was guilty of such contributory negligence as to preclude her from recovering. It being undisputed that she went to the depot in the nighttime, and that it was so dark that one could not see, and it being undisputed that she and the two parties accompanying her to the station saw, by the light of a lamp in the white waiting room, how to get upon the platform at the station, and that they took a step upon the step and a step from the step up on the platform, and she was then put upon notice that the platform she had entered was a raised platform, and neither under the facts nor as a matter of law could she assume that the platform was not raised at any other place; it being further undisputed that she was never at this station and upon this platform before; it being undisputed that Jane Perry, the woman accompanying her to the station, had lived in the town of Voth, where this station was, for more than five years, and it being undisputed that when the said Emma Hadnot went to leave the colored waiting room, she neither asked the agent if she could leave the platform safely any other way than the way upon which she had come, nor that she asked Jane Perry, who accompanied her out of the room, whether or not she could turn to the right and leave the platform safely, or whether she should turn to the left and go back the way from which they had come upon the platform; it being further undisputed that, when she and Jane Perry came out of the colored waiting room, Jane Perry closed the door behind them, cutting out the light from the platform; and when she testified that she was not looking for any steps, and that she did not think about any steps, and that she just thought everything was all right, and did not give it a thought at all, and that the only thing she was thinking about was what she wanted to do, and that she was not thinking about the platform, but that she was in a hurry, and wanted to get outdoors, and that she walked out into the dark, walked towards the right, and not towards the left, the way she had come upon the platform— all such facts force one to the inevitable conclusion that, as a matter of law, she exercised no character of care and was guilty of such negligence as to preclude her, as a matter of law, from recovering.

Another Texas case directly in point is the case of Railway Co. v. Hodges, 24 S. W. 563. The facts were these:

"It seems that the place where appellee fell from the platform was at the time enveloped in almost total darkness; that he got off the train on the east side of the depot, and immediately started in a northwest direction along the depot platform, and walked off of it at a place where it was between four and five feet high. In describing the manner in which he proceeded, he says: 'I do not remember changing my gait at the time I alighted from the train until I fell. I got on the platform so easy that I thought I could leave it as easy. When I got to the top of the platform, where I fell, I did not change my gait, but my right foot went out, and I did not touch the platform, and in consequence thereof I fell. I do not remember looking for the top of the platform. It was too dark to look for anything. I was not the first man to alight from the train on the night in question. I did notice people leaving said train, and going down the lighted platform. I was attending to my own business, and did not pay any attention to the other passengers. There were no passengers that went to the north end of the platform on that night that I know of. I did not walk

along the platform cautiously, or feeling my way to get off; but, as I stated before, I was walking as though I was going to some place. I was walking along regardless of everything until I received the injuries. I mean that I wanted to get from where I was to where I wanted to go without paying any attention to the way I was going. I did not feel my way along, because I was not thinking of falling. The steps on the northeast corner of the depot are broad steps, broad enough to enable two persons to walk down them. I never thought of any step in going to the Virginia House. I thought I was on level ground. When I walked up toward those steps I would have used them could I have seen them. I never saw those steps until after the date of the accident. I have no knowledge of the fact. I was not thinking anything about steps, but was walking as though I was going to some place; and the first thing I knew I fell off.'"

The court held as follows, under these facts, citing with approval Reed v. Axtell, 84 Va. 231, 4 S. E. 587:

"It seems to us, for a man 76 years old to proceed along a railroad platform in the dark, in the manner here described, necessarily conveys the idea of negligence."

See, also, Hickman v. Railway Co., 180 Mo. App. 431, 167 S. W. 1178; Reed v. Richmond & A. R. Co., 84 Va. 231, 4 S. E. 587; Railway Co. v. Turley, 85 Fed. 369, 29 C. C. A. 196; Emery v. Railway Co., 77 Minn. 465, 80 N. W. 627; Railway Co. v. Sanderson, 175 Ky. 11, 192 S. W. 869, L. R. A. 1917D, 890; Bennett v. Railway Co., 57 Conn. 422, 18 Atl. 668; Bremer v. Pleiss et al., 121 Wis. 61, 98 N. W. 945; Massey v. Seller, 45 Or. 267, 77 Pac. 397.

We believe from the facts, as above stated, that the court should have sustained a peremptory instruction, as requested by appellant. We are of opinion, as above said, that the facts are undisputed, and the court should have stopped the proceeding without going further. Believing as we do, we are of opinion that the case should be reversed, and judgment here rendered in favor of appellant; and it is so ordered.

⊗⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes